# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

George Miguel Tiaffay,

       Petitioner

v.

Terry Royal,[1] et al.,

       Respondents

Case No.: 2:20-cv-02257-JAD-EJY

**Order Denying Writ of Habeas Corpus and Closing Case**

[ECF No. 31]

Nevada state prisoner George Miguel Tiaffay filed a counseled second amended petition for a writ of habeas corpus under 28 U.S.C. § 2254,[2] challenging the constitutionality of his confinement for life imprisonment without the possibility of parole based on state-court convictions related to the 2012 murder-for-hire of his wife.[3]  Two of Tiaffay's claims were previously dismissed as unexhausted.[4]  His remaining claims assert that his trial counsel provided ineffective assistance in violation of the Sixth and Fourteenth Amendments by failing to pursue an insanity defense, present mitigating evidence at sentencing, or object to the prosecution's misstatement of evidence during penalty-phase closing arguments.  Because Tiaffay has not shown that his counsel's conduct was constitutionally deficient for failing to investigate and present evidence of Tiaffay's delusions or prescription-drug use at trial or sentencing, I deny Grounds 3 and 4(A) of his petition.  But because reasonable jurists may find

---

[1] According to the state corrections department's inmate-locator page, Tiaffay is currently incarcerated at Ely State Prison where Terry Royal is the warden.  *See* NDOC Inmate Search; *Ely State Prison Facility | Nevada Department of Corrections.*  So I direct the Clerk of Court to substitute Terry Royal for Respondent Calvin Johnson under Fed. R. Civ. P. 25(d).

[2] ECF No. 31.

[3] ECF No. 14-3.

[4] ECF Nos. 77, 83.

debatable my conclusion that counsel's failure to investigate Tiaffay's mental health and drug use as mitigation evidence at sentencing, I grant him a certificate of appealability on Ground 4(A) only. I also dismiss Ground 4(B) as procedurally defaulted because Tiaffay has not presented a substantial claim that counsel's failure to object during the State's closing argument was prejudicial.

## Background

### A.    Tiaffay hires his handyman to kill his wife Shauna.

In December of 2011, Tiaffay commenced divorce proceedings against his wife Shauna.[5] Tiaffay was a fireman and Shauna was a cocktail waitress at the Palms Resort and Casino.[6] They maintained separate bank accounts, he earned twice as much money as Shauna, and Shauna gave Tiaffay cash for household expenses.[7] They argued about "a lot of things," and Tiaffay thought Shauna spent too much money on purses and salon visits.[8]

Noel Stevens performed handyman work for Tiaffay.[9] In February of 2012, Stevens moved out of his sister's home after injuring his hand while stabbing his nephew.[10] Tiaffay bandaged the hand and Stevens stayed at Tiaffay's house for a couple of days.[11] At that time,

---

[5] ECF No. 32-12 at 44. The audio recording of Tiaffay's interview with Metro was admitted at trial. *See* ECF No. 56-1 at 123–24.

[6] ECF No. 32-12 at 3, 11, 47.

[7] *Id*. at 32–36.

[8] ECF No. 56-1 at 97-102, 189–90; ECF No. 57-2 at 68–70.

[9] ECF No. 56-1 at 182–83.

[10] ECF No. 56-1 at 185–86; ECF No. 57-2 at 90–91.

[11] ECF No. 56-1 at 189–191.

Tiaffay still lived with Shauna and their daughter, M.T.[12]  When Shauna threatened to call the police about Stevens being a drug dealer,[13] Stevens left to camp out in the nearby desert.[14] Tiaffay left food and water out for Stevens, and the fireman and handyman called each other often.[15]

By summer, Tiaffay and Shauna sold their house and moved to separate residences.[16] While packing Shauna's belongings at Tiaffay's request, Stevens stole one of her rings because she had threatened to call the police about him.[17]  Stevens had no identification and enlisted Earl Welch, who worked at a nearby Chevron gas station, to pawn the ring.[18]  Stevens told Welch that he was staying with a fireman, painting his house and performing handiwork.  Stevens had "full access" to Tiaffay's house, kept clothes and tools in Tiaffay's garage, and showered there.[19] During that time, Tiaffay complained that he did not trust Shauna and put his money in his mother's name.[20]  Tiaffay was upset that Shauna asked for a family-court order that Tiaffay give

---

[12] *Id*. at 187.  This district's local rules direct that only the initials of minors should be used in court filings.  L.R. IA 6-1.  Because Tiaffay's daughter was a minor at the time of the offenses, I refer to her as "M.T." throughout this order.

[13] ECF No. 56-1 at 191; ECF No. 57-2 at 90.

[14] ECF No. 56-1 at 191–92; ECF No. 57-2 at 6–8.

[15] ECF No. 57-2 at 7; ECF No. 60-1 at 88–90 (21 calls in February; 20 calls in March; 17 calls in April; 36 calls in May; 20 calls in June; 8 calls in July; 40 calls in August; and 87 calls in September).

[16] ECF No. 55-1 at 107–10; ECF No. 56-1 at 147–48, 192, 221; ECF No. 58-1 at 155–58.

[17] ECF No. 56-1 at 199–201.

[18] ECF No. 57-2 at 20–24; ECF No. 58-1 at 189–93, 223–27.

[19] ECF No. 56-1 at 219–20; ECF No. 57-2 at 61–63.

[20] ECF No. 57-2 at 68.

his mother's money to Shauna and that Tiaffay be ordered to pay her $1,400 a month—twice what Tiaffay thought was reasonable.[21]

Tiaffay offered to pay Stevens $1,000 to kill Shauna, but Stevens thought Tiaffay was "blowing off smoke."[22] When Tiaffay offered $5,000, Stevens took him seriously.[23] Stevens told Welch, "I'm about to do an 'M'" and it was "worth 20,000-something" to him.[24] Stevens believed that Tiaffay promised to pay him $100 a week until he received insurance money from Shauna's death, although Tiaffay didn't have a life-insurance policy for Shauna.[25] Stevens was previously prescribed medication for hallucinations and "hearing voices," but he denied that those voices told him to kill Shauna and maintained that Tiaffay hired him for the job.[26]

Stevens and Tiaffay several times discussed how and where Stevens should kill Shauna.[27] The plan was for Tiaffay to be at work when it happened.[28] They discussed Stevens hitting her on the head, putting her into a vehicle, and driving the vehicle into a wall so that, without a seat belt, she would fly through the windshield and hit her head, but Tiaffay rejected that idea after he learned that a pathologist would realize she was hit before the crash.[29] They discussed placing a zip tie around her neck so she could not breathe but rejected that idea because Stevens could get

---

[21] ECF No. 56-1 at 211–12; ECF No. 57-2 at 68.

[22] ECF No. 56-1 at 192–94.

[23] *Id*. at 198.

[24] ECF No. 58-1 at 194–97.

[25] ECF No. 32-12 at 69; ECF No. 56-1 at 198–99.

[26] ECF No. 57-2 at 72–74, 114–17.

[27] ECF No. 56-1 at 201.

[28] *Id*. at 205.

[29] *Id*. at 201–02.

scratched and law enforcement had his DNA.[30]  They discussed using a hammer: Stevens wanted to use a sledgehammer because it would be done in one blow, but Tiaffay thought he should use a light hammer with a fiberglass handle as it would swing faster without breaking.[31]  They purchased several hammers, buying all except one with cash, and Tiaffay decided that Stevens should use a fiberglass claw hammer.  He also told Stevens not to use the one they bought with Tiaffay's credit card.[32]

In September of 2012, Tiaffay told Stevens that Shauna worked a swing shift from 6:00 p.m. to 3:00 a.m., Friday through Tuesday.[33]  Tiaffay told Stevens that he and Shauna were "doing good" and to kill her soon because their improved relationship would deflect suspicion away from Tiaffay.[34]  Stevens and Tiaffay discussed killing Shauna at the Palms because she parked at a nearby apartment complex where Stevens could sneak up behind her.  Tiaffay gave Stevens a map of where she parked.[35]

Tiaffay also gave Stevens a key to Shauna's apartment and showed him its location.[36] Stevens went to Shauna's apartment but did not use the key because she left the front door open.[37]  Stevens stole jewelry and women's underwear and testified that he "might have" left a pair of his own underwear there.[38]  Stevens believed he was allowed to take anything he wanted

---

[30] *Id*. at 202–03.

[31] *Id*. at 203, 206–07.

[32] *Id*. at 207, 210–11.

[33] *Id*. at 205; ECF No. 58-1 at 146–47.

[34] ECF No. 56-1 at 221–22.

[35] *Id*. at 203–04.

[36] *Id*. at 204, 212.

[37] *Id*. at 213–14.

[38] *Id*.

as long as he went through with the murder.[39]  Shauna later texted Tiaffay a picture of underwear she found in her apartment and asked if anyone was in her apartment.[40]  Tiaffay asked Stevens if he took jewelry and women's underwear from Shauna's apartment, but Stevens denied it.[41]

**B.    After three failed attempts, Stevens uses a hammer to murder Shauna at her apartment.**

In early September, Stevens purchased a 16-ounce claw hammer and went to the Palms to kill Shauna but abandoned his plan because several police officers were present for a concert.[42]  Telephone records confirmed that Stevens's cellphone pinged a tower on the Las Vegas Strip that night.[43]  A week later, Stevens and Tiaffay were captured on video using cash to buy a 16-ounce hammer, gloves, a Coleman knife, and beanies.[44]  Stevens returned to the Palms that night to kill Shauna, but he was arrested before he could attempt to do so.  The police confiscated black gloves, a Coleman knife, a black beanie with holes cut for eyes, and a 16-ounce claw hammer.[45]  Stevens called Tiaffay upon his release three days later.[46]

Undeterred, and with his claw hammer confiscated, Stevens then bought a 12-ounce ball-peen hammer.[47]  Tiaffay told Stevens that Shauna had lost her garage-door opener, so she had to

---

[39] *Id*. at 215.

[40] *Id*. at 157–58.

[41] ECF No. 57-2 at 24–25.

[42] ECF No. 56-1 at 208; ECF No. 58-1 at 91–95; ECF No. 60-1 at 64–65.

[43] ECF No. 60-1 at 104–05.

[44] ECF No. 57-2 at 191–96; ECF No. 58-1 at 122–26.

[45] ECF No. 56-1 at 208–10; ECF No. 58-1 at 111–21; ECF No. 60-1 at 85–88.

[46] ECF No. 56-1 at 210.

[47] *Id.*; ECF No. 58-1 at 95–96.

walk around the building to her apartment's front door.[48]  So Stevens hid inside a garbage bin

across from Shauna's apartment door with the ball-peen hammer but as he stepped out of the bin

a police helicopter lit the area, sending him back into hiding.  He eventually threw the hammer in

a bush and left.[49]

On September 28, 2012, Shauna got a new garage-door opener.[50]  Tiaffay relayed that

information to Stevens and told him that Shauna was not at home that day.[51]  Stevens needed

money and wanted to look for things to steal, so he entered her apartment without telling

Tiaffay.[52]  Tiaffay called Stevens one minute after his last call with Shauna that evening.[53]

Stevens returned to Shauna's apartment that night and drank while waiting several hours for her

to come home after her shift ended at 3:00 a.m.[54]  He hid "jewelry and purses" and "stuff" inside

a closet downstairs so he could take them after he killed her.[55]

Stevens waited inside Shauna's downstairs bathroom wearing a mask and gloves until she

arrived home.[56]  When she walked by the bathroom door, he came out with a wood-handled

hammer, she asked him why he was doing this and, without reply, he hit Shauna in the head, she

hit the floor, and he jumped on top of her and hit her with the hammer until it broke.[57]  He

---

[48] ECF No. 56-1 at 215–16.

[49] *Id*. at 216–19.

[50] ECF No. 59-1 at 21–24.

[51] ECF No. 56-1 at 224.

[52] *Id*. at 222–23.

[53] ECF No. 60-1 at 120–24.

[54] ECF No. 56-1 at 223–25.

[55] *Id*. at 225–26.

[56] *Id*.

[57] *Id*. at 227–30.

discarded the wood handle, grabbed the metal piece, and hit her until she stopped moving.[58] Stevens left with the hammer but he forgot to take her bag—which Tiaffay told him to take to make it look like a robbery—so he returned for it, but then he forgot the items he'd hid in the downstairs closet.[59]  He left through the garage door, leaving it open as "the sign" to Tiaffay "that it's done."[60]

Shauna's bag contained over $1,000 in cash and casino chips.[61]  Stevens went to Tiaffay's house, threw away his shirt and mask, buried the hammer, stowed the rest of his property in a bag in a bush, changed his shirt, and went to the Chevron to gamble and drink alcohol.[62]  He noticed blood on his jeans, changed them at his camp, and returned to the Chevron.[63]  Stevens enlisted Welch to cash Shauna's casino chips for $270 at the Palms.[64] Welch dropped Stevens at the Goodwill store near the Chevron, and Stevens hid Shauna's apartment key there.[65]

At around 9:00 a.m. on September 29th, Tiaffay called 911 to report that Shauna was dead inside her apartment.[66]  The medical examiner later determined that Shauna had died from "multiple blunt force injuries due to assault" and suggested that a hammer caused some of her injuries, including abrasions to the right side of her face, skin tears on her right ear, fractures on

---

[58] *Id.*

[59] *Id.* at 230–32.

[60] *Id.*

[61] *Id.* at 235.

[62] *Id.* at 235–37.

[63] ECF No. 56-1 at 237–38; ECF No. 57-2 at 19.

[64] ECF No. 57-2 at 20, 29–31; ECF No. 60-1 at 26–29.

[65] ECF No. 60-1 at 31.

[66] ECF No. 55-1 at 82–84; ECF No. 56-1 at 123.

the front and back of the right side of her skull, and defensive fractures to her fingers.[67]  The Las

Vegas Metropolitan Police Department (Metro) found "clothes, jackets, bags of jewelry, [and]

bags of watches" inside the downstairs closet.[68]

**C.    Stevens tells a friend that he'd committed murder-for-hire, and after the friend turns him in, Stevens tells the police that Tiaffay hired him.**

That evening, Stevens went to see his friend William Pennix.[69]  Stevens told Pennix he'd

just murdered the wife of the man he did jobs for, he'd hit her ten times until the hammer broke

and then hit her with the hammer claw, and that he was paid $600.  He also said that the man was

to give him additional money and arrange for him to leave town.[70]  Stevens thought Tiaffay

wouldn't call him from his phone number but from a "throw away phone."[71]  Stevens did not

answer several calls to his phone and told Pennix, "It's the guy I worked for, that I do odd jobs

for.  You know who it is.  I told him to stop calling me, don't be calling me.  I'll tell him when I

pick the money up."[72]  Tiaffay's telephone records confirmed calls to Stevens at 5:46 and 6:22

p.m.[73]  Stevens answered one call and Pennix heard him say, "I told you not to call me here.  I'll

tell you when I come get it."[74]

---

[67] ECF No. 56-1 at 10, 13–20.

[68] ECF No. 60-1 at 43.

[69] ECF No. 56-1 at 43; ECF No. 57-2 at 32, 75–76.

[70] ECF No. 56-1 at 44–47.

[71] ECF No. 57-2 at 33–34.

[72] *Id*. at 45–46.

[73] ECF No. 60-1 at 113.

[74] ECF No. 56-1 at 46.

The next day Pennix saw the news about the murder and took Metro homicide detectives to search for Stevens.[75]  Meanwhile, Stevens became paranoid that Tiaffay would kill him because Tiaffay had, out of the blue, purchased bullets for his gun the day of the murder.[76] Stevens walked by Tiaffay's house to see if he could get his money, but there were police everywhere.[77]  Stevens recognized an incoming call from the number for Tiaffay's mother but he didn't answer it.[78]  Telephone records confirmed that the telephone number for Tiaffay's mother made four unanswered calls to Stevens's number that day.[79]  That evening, Stevens asked Welch to call Tiaffay using the Chevron phone.[80]  Welch left a voicemail message stating, "Noel said to meet him at some store," and Stevens got mad at Welch for stating his name.[81]  Tiaffay's telephone records confirmed a call from Chevron at 5:07 p.m., and to Chevron at 6:17 p.m.[82]

Metro homicide detectives found Stevens at the Chevron and detained him.[83]  Stevens had a knife and a bag of marijuana.[84]  He was taken in for questioning and was later arrested for possession of a controlled substance.[85]  Stevens spoke with police about Tiaffay and Shauna but he did not initially admit to killing Shauna.[86]  But when Stevens was confronted with a pair of

---

[75] *Id.* at 50–56, 72; ECF No. 60-1 at 11–21.

[76] ECF No. 57-2 at 35–36.

[77] *Id.* at 36–37.

[78] *Id.* at 37–38.

[79] ECF No. 60-1 at 114–17.

[80] ECF No. 57-2 at 38.

[81] *Id.*; ECF No. 58-1 at 202–05.

[82] ECF No. 60-1 at 126–29.

[83] ECF No. 57-2 at 39.

[84] ECF No. 60-1 at 20–21.

[85] *Id.*

[86] ECF No. 57-2 at 40.

bloody jeans that Metro found at his campsite, he believed that Tiaffay had led police there

because no one else knew its location.[87]  So Stevens chose to cooperate and took police to the

murder weapon,[88] the ball-peen hammer he hid in a bush at Shauna's apartment complex,[89] and

Shauna's apartment key.[90]  At Tiaffay's house Metro found three hammers and .380 caliber

ammunition.[91]  Tiaffay's cellphone contained deleted text messages to and from Stevens.[92]

       Tiaffay was under covert surveillance by Metro Sergeant Thomas Fletcher and other

officers.[93]  In an attempt to draw him out, Metro detectives told Tiaffay's mother and sister that

they knew Tiaffay was involved in Shauna's murder and that they intended to arrest him for

murder and related charges.[94]  Shortly after that conversation, Fletcher followed Tiaffay to his

mother's house and when Tiaffay left, he drove "completely different"; he was "more erratic,"

"weaving in and out" of traffic, driving and accelerating past the speed limit, and ignoring stop

signs and red lights until his truck ran into concrete wall, rendering him temporarily

unconscious.[95]

       Stevens's jeans bore DNA profiles consistent with Shauna and Stevens; Stevens's DNA

was found on a bottle of vodka in Shauna's apartment and on the key to her apartment; Shauna's

DNA was found on the murder weapon; and DNA profiles consistent with Tiaffay and Stevens

---

[87] *Id*. at 46–48, 129–33.

[88] *Id*. at 49.

[89] *Id*. at 120.

[90] ECF No. 60-1 at 37–38.

[91] *Id*. at 71–81.

[92] ECF No. 56-1 at 160–61.

[93] ECF No. 58-1 at 11–12, 15.

[94] ECF No. 60-1 at 46.

[95] *Id*. at 13–21

could not be excluded as contributors to a mixed DNA profile found on a different hammer at Tiaffay's residence.[96]  To avoid the possibility of the death penalty, Stevens testified against Tiaffay and pleaded guilty to numerous charges, including first-degree murder with use of a deadly weapon and conspiracy to commit murder.[97]

**D.    Tiaffay was sentenced to life imprisonment without the possibility of parole for his role in Shauna's killing.**

A jury found Tiaffay guilty of first-degree murder with use of a deadly weapon, conspiracy to commit murder, possession of burglary tools, conspiracy to commit burglary, conspiracy to commit robbery, and burglary while in possession of a deadly weapon.[98]  At the penalty phase of the trial, trial counsel elicited testimony from family and friends about Tiaffay's intellect, military service, firefighting career, and good character.  Tiaffay's younger brother testified that they were raised in a "pretty religious family" and after their father died when they were teenagers, Tiaffay led the family through tough times running the family ranch, which required daily attention to thousands of chickens, as well as hogs, cattle, and sheep.[99]  Tiaffay's sister testified that Tiaffay's grades in school were "exemplary," he managed a side job, worked on the ranch, played football, and was the Homecoming King and class Valedictorian.[100]  He attended West Point and was commissioned as an Army second lieutenant.[101]  He then took a job

---

[96] ECF No. 58-1 at 69–84.

[97] ECF No. 57-2 at 50–52, 99–101.

[98] ECF No. 14-3.

[99] ECF No. 62-3 at 38–41.

[100] *Id*. at 27–28.

[101] *Id*. at 28–30.

as a facilities engineer for Kraft Foods in Chicago.[102]  His brother explained that he left that job to become a firefighter in Las Vegas because "he wanted to make his life mean something and contribute something to . . . things greater than himself . . . ."[103]

Fellow firefighter and friend Andrew Steyn also testified about Tiaffay's character. Steyn had known Tiaffay since their first day of fire academy in 2002.[104]  He described Tiaffay as "hard working, compassionate," and "one of the best people" Steyn ever knew.[105]  Tiaffay was the initiator and commander of the Honor Guard, a group of volunteers who perform funeral-flag and drum-and-bagpipe ceremonies when there is a line-of-duty death.[106]  Steyn testified that Tiaffay "would help anybody; give the shirt off his back, the meat off his plate,"[107] and described him as "one of those guys that is friendly to everybody, just doesn't—doesn't care about himself. Just does everything for everybody else."[108]  During closing argument, defense counsel asked the jury to consider Tiaffay's commitment to his community and impose a life sentence with parole so that he could have the "opportunity to continue serving" his community outside of prison.[109]

The State sought life without parole, arguing that it was precisely because of Tiaffay's accomplishments that the jury should hold him to a higher standard.  The prosecutor argued that his conduct was unforgiveable, opining that "it's not like he got hooked on drugs and made a mistake.  It's not like he was an alcoholic, and he crashed his car into somebody and you can say

---

[102] *Id*. at 30–31.

[103] *Id*.

[104] *Id*. at 34.

[105] *Id*.

[106] *Id*. at 35–36.

[107] *Id*.

[108] *Id*.

[109] *Id*. at 45.

to yourself, that's something that is forgivable."[110]  The State asked the jury to think about how

many times Tiaffay "had the opportunity to end this" and "how many times Noel Stevens was

incapable of completing the plan," i.e., "at least 30 days of premeditation and deliberation;" "30

days for the hero to stop Noel Stevens."[111]  The State argued that Tiaffay "knew what he was

doing" when he "knowingly" and "voluntarily" participated in a "30-day conspiracy" to have his

wife killed.[112]

The jury sentenced Tiaffay to life imprisonment without the possibility of parole for the

first-degree murder conviction.[113]  Later, for sentencing on the remaining counts and

enhancements, the trial court explained that the murder made "no sense" and appeared to be

"pure evil":

> THE COURT: Mr. Tiaffay, there is absolutely no doubt that
> Shauna, your wife, was a truly loved individual.  I've never seen
> the support of so many family members and friends who, to every
> word, have nothing but glowing comments about your wife as a
> person, friend, daughter, sister, mother.  But at the same time, I get
> letters and comments and remarks from people who know you, and
> universally, they are what a wonderful human being you are,
> humanitarian you are, how smart you are, how inspiring that
> you've been to so many people.  And I recall your sister testifying,
> and you can see, in her eyes, just total love and commitment to
> you.
>
> And this just makes no sense, what happened here.  And I think
> that's why it took the jury as long as it did in this case to reach a
> verdict.  Because no one can understand why you, of all people,
> would do something that you know would be so, so cruel to so
> many people beyond just Shauna.  And I think the jury really
> struggled with that and just had a hard time grasping it.
> But, ultimately, the evidence in the case—and I saw and heard the
> evidence, and I concur in the jury's verdict in this case.  The

---

[110] *Id.* at 46–47.

[111] *Id.*

[112] *Id.* at 47–48.

[113] *Id.* at 54.

evidence in this case proved beyond a reasonable doubt that you essentially hired this individual, Noel Stevens, to commit an unthinkable murder against an individual that you obviously, at one time, loved deeply, and that so many other people love deeply. And I know that you're all going to say, down the line, that this was all Noel Stevens and that he's crazy, but I saw him up here on the stand and he—while I agree he's mentally disturbed and his soul has probably been robbed by drugs and alcohol over the years—the truth is consistent. That's the one thing I always said when I was involved in litigation with witnesses, is just tell the truth because it doesn't change. You never have to remember your story if you tell the truth. And this person, Stevens, never, never wavered in terms of what he testified. I think he was telling the truth, and the jury obviously concluded the same thing.

[The prosecutor] makes the point that, you know, perhaps we should hold you to a higher standard because of your background and all the good works you've done, and I—I tend to disagree with that. I tend to sort of look at what [defense counsel] says. You know, let's focus on the good you've done in terms of taking that in consideration and moderating what the sentence should be. And I have thought about this a number of times, and ultimately, every time I start thinking about how your past should moderate anything done in this case, I'm always stopped by Mr. Stevens'[s] testimony, that you had him buy another hammer with a fiberglass handle because you were concerned that the wooden handle would break. And I have two hammers at my house that I've had in the 28 years that I've owned that house—wooden handled hammers— and I've pounded on those things. I've never once pondered the possibility that the handles would break. But you did. And I can't imagine what it would take to break a wooden handle of a hammer, but you pondered that. You were concerned about that, and it happened in this instance. And so you allowed this to go forward knowing the most vicious attack that I can imagine was going to happen.

And so my sentence today is not based upon holding you to a higher standard. My sentence is based upon the fact that this was just pure evil. And you'll have your lifetime ahead to contemplate how evil and unthinkable this act was.[114]

---

[114] ECF No. 62-7 at 20–23 (cleaned up).

1  The trial court imposed an aggregate sentence of life without the possibility of parole with a

2  consecutive 388 to 972 months.[115]  The Nevada Court of Appeals affirmed.

3  **E.**    **Tiaffay's state postconviction proceedings introduced new psychological evidence that his prescription-drug use, combined with other factors, may have caused deific-decree delusions telling him to kill his wife.  The Nevada courts denied him relief.**

5  Tiaffay filed a state postconviction habeas corpus petition raising claims that trial counsel

6  was ineffective for failing to present evidence to support a not-guilty-by-reason-of-insanity

7  defense and mitigation evidence concerning Tiaffay's medications and mental health.[116]

8  Psychiatrist Dr. Daniel Sussman and trial counsel testified at an evidentiary hearing.[117]

### 1.    *Sussman diagnosed Tiaffay with psychological impairments possibly caused by hormone therapy and Adderall use.*

11  In 2018, Sussman prepared a Psychiatric Evaluation report.[118]  At that time, Tiaffay

12  reported no hallucinations, delusions, or formal thought disorder.[119]  Sussman's evaluation states

13  that Tiaffay "self-diagnosed" himself as previously having substance-induced psychosis due to

14  Adderall.[120]  He also reported that he was prescribed testosterone and an estrogen blocker to treat

15  hypotestosteronemia (low testosterone levels, a condition endemic to firefighters) and later began

16  taking Adderall to reduce brain fog caused by his hormone therapy.[121]  Tiaffay told Sussman that

17  his marriage to Shauna had been strained and he "got more irritable and paranoid and

---

[115] *Id*. at 24.

[116] ECF Nos. 20-8; 20-9; 20-10.

[117] ECF No. 64-11.

[118] ECF No. 34-8 at 2.

[119] *Id*. at 8.

[120] *Id*. at 6.

[121] *Id*. at 6–7.

suspicious" of her while taking Adderall and hormones.[122]  Tiaffay told Sussman that, while on

Adderall, he began having auditory hallucinations of an evil voice telling him to kill his wife to

save their daughter because his wife was going to lead her astray.  Tiaffay reported that he

thought he was talking to God because he'd experienced God talking to him in the past.[123]

Tiaffay reported that the voices were not external or vivid, describing them as "more like self–

talk or an inner–most impression."[124]  He also told Sussman that his testosterone treatment made

him "more aggressive" and that his co-workers at the time noticed his personality change.[125]

Sussman reviewed Tiaffay's medical record generated on September 27, 2012, just two

days before the murder, and noted "the presence of 'anxiety, depression and insomnia,'" but that

Tiaffay "denied hallucination" to his doctor that same day.[126]  Sussman concluded that "[Tiaffay]

likely decompensated between 2010 . . . and 2012" due to his "medication regimen," that "his

actions leading up to the murder were out of character and attributable to psychiatric

decompensation," and although "he maintained a degree of functionality throughout that likely

decompensation," "there was likely a degree of significant psychiatric impairment at the time,

but not florid insanity."[127]

At the state postconviction evidentiary hearing, Sussman testified that, despite his

opinions about criminal responsibility contained in his evaluation, he "didn't think much about"

an insanity defense as he was not asked to consider it and was focused instead on whether trial

---

[122] *Id.* at 6.

[123] *Id.* at 5.

[124] *Id.* at 6.

[125] *Id.* at 7.

[126] *Id.* at 5, 84.

[127] *Id.*

counsel was ineffective for failing to present mitigation evidence at the sentencing phase.[128] Sussman considered the psychiatric evidence "minimally mitigating" for an insanity defense and was neither prepared nor qualified to opine on it.[129]

Concerning mitigation for the penalty phase, Sussman explained that the combination of Tiaffay's hormone therapy and Adderall use may have contributed to psychological decompensation and delusional thoughts at the time of Shauna's murder.[130]  Sussman explained that testosterone "increases exploratory behavior [and] libido and clearly can increase aggression" and that Tiaffay described testosterone as making him more aggressive.[131]  Tiaffay told Sussman that he felt like something "snapped with Adderall," and Sussman testified that Adderall is "an amphetamine," which can cause "impaired reality testing and psychosis," though he noted in his report that those effects are far less likely to occur from prescription amphetamines like Adderall than they are from illicit methamphetamines.[132]  He further explained that "impaired reality testing" includes "hallucinations, delusions, just very skewed poor judgment, bizarre highly idiosyncratic ideas, disorganized thoughts" and a form of psychosis.[133]

Sussman testified that Tiaffay told him that, at the time of the offenses, he had a "firm false fixed delusion [that] God was talking to him and there was both a God's voice and an evil voice which it had always been God's voice before, but the evil voice was starting to compete

---

[128] ECF No. 64-11 at 27.

[129] *Id*. at 27, 32, 38–39.

[130] *Id*. at 8–9.

[131] *Id*.

[132] *Id*. at 9–11; ECF No. 34-8 at 10–11.

[133] ECF No. 64-11 at 9–11 (cleaned up).

with that and it was telling him that he had to do something to his wife" "[t]o prevent [Shauna] from taking his daughter astray."[134]  Sussman stated that it was not a "bizarre delusion and it's not a far–fetched delusion" but "ha[d] a soft delusional component to it."[135]  Although the presentence-investigation report states that Tiaffay denied incidents of childhood physical abuse or neglect at the time,[136] Sussman testified that Tiaffay told him—several years after his conviction—that he was "physically abused" when he was young.[137]  Sussman believed that Tiaffay was "prone to very soft possibly psychotic symptoms maybe from an early age" because of that abuse and "might have been prone to some mildly odd and idiosyncratic thinking over time."[138]

Sussman testified that Tiaffay was "very functional and was an upstanding person" but, while under extreme duress caused by his divorce, his vocation, and his prescription-medication regimen, he exhibited aberrant and uncharacteristic behavior and skewed judgment and "was starting to develop a pattern of thoughts" that lacked judgment and were "taking him to a dark place."[139]  Sussman also opined that Tiaffay's drug regimen "could easily have been the factor that" was the "tipping point" because he "wasn't prone to anything like that ever before."[140]  Sussman explained, "[h]ow do you get from the connection you're going to lead my daughter

---

[134] *Id*. at 29–30.

[135] *Id*.

[136] Tiaffay informed the trial court at sentencing that he went over the PSI with trial counsel and saw nothing in it that required correction.  ECF No. 62-7 at 4.

[137] ECF No. 64-11 at 12–13.

[138] *Id*.

[139] *Id*. at 13–15.

[140] *Id*. at 13–15, 30, 33–36, 41–43.

1  astray to doing the horrible tragic miserable thing of killing a person?  That's what skewed

2  judgment does.  Skewed judgment takes you there."[141]

### 2. *Trial counsel testified that he made a strategic decision to avoid a drug-induced-murder defense and that Tiaffay appeared competent and religious, not delusional, throughout trial.*

5  Trial counsel testified that, about a month into the case, Tiaffay confessed to him that he

6  had orchestrated Shauna's murder because she was leaving him, and he couldn't stand the

7  thought of Shauna taking away his child, having custody of her, or exposing her to other men.[142]

8  Tiaffay agreed with the defense strategy for the guilt phase of the trial that Stevens "acted alone"

9  and the State failed to prove that a conspiracy existed between Tiaffay and Stevens.[143]  Tiaffay

10 did not tell trial counsel that he suffered from delusions, and counsel did not perceive that

11 Tiaffay had any mental disease or defect.[144]  Counsel believed that the evidence of the prolonged

12 period of premeditation and deliberation precluded a successful insanity defense.[145]  Counsel did

13 not investigate a mental-health defense for trial because counsel never saw any mental-health or

14 competency issues.[146]  He believed that a mental-health defense was inconsistent with the

15 defense strategy and obtained none of Tiaffay's medical records because they "would have

16 played no part in the ultimate decision for the trial strategy."[147]

---

[141] *Id*. at 8–11, 32–33 (cleaned up).

[142] *Id*. at 52, 55, 61.

[143] *Id*. at 44–45, 54, 56, 65.

[144] *Id*. at 47–48, 64.

[145] *Id*. at 50, 61.

[146] *Id*. at 46–48.

[147] *Id*. at 47, 49.

Counsel initially testified that Tiaffay told him God made him do this, but he later qualified that testimony, explaining that Tiaffay only told him that he believed God would use the circumstances for God's purpose and would exonerate him:

> Q:  Okay. Did he tell you—did George Tiaffay tell you that he thought God had made him do this?
>
> A:  At one point he did, yes.
>
> Q:  And was he adamant that this was something that God had commanded.
>
> A:  No. No.
>
> Q:  But he told you at one point that's what it—that's what had occurred?
>
> A:  At another point he told me that he didn't really know why. 'Cause I asked him, well why if God, you know, was okay with you committing this murder why is it that God is going to, you know—you know now that I go back and think of it I don't think he ever told me that God was okay with him committing the murder, that he was directed by God to murder his wife, but it was more that God was going to use it to God's purpose.
>
> So he believed that he was going to be exonerated, found not guilty at trial and that he was going to get out, that there was some greater purpose to his life, that God was going to fulfill in him. So, not necessarily—he never expressed that I was the instrument of her death at the direction of God. No.
>
> Q:  It was more some type of delusion regarding God, that God had a plan and that he was in this plan?
>
> A:  Yes. But is that delusion?
>
> Q:  So in your mind was it a delusion?
>
> A:  No.
>
> . . . .
>
> A:  You know, people when they are sitting in custody accused of murder will often time find justifications for what they did or they'll find some solace for, you know, what has taken place. You know, I didn't do it or—people have done worse things than I have done. Oh and you get all sorts of mixtures of religion and justification.
>
> Q:  So did you think this was him justifying this based upon his belief in God?
>
> . . . .
>
> A:  Well so, you know, like a lot of people, Mr. Tiaffay became hyper religious when he was in custody. And so that happens. It just happens.

Q:     So again you said at one point you thought that he had on one occasion told you that God commanded it, but then you said that you're not sure that actually happened?

A:     Yeah.  I mean, so—it was the wily phrasing of the question. I don't think he actually said God told me to kill my wife. But he did—he was insistent that God was going to find a purpose for him going through the trial and getting exonerated.

Because one of my questions at one point particularly when we were—when I thought we might be able to negotiate the case one of my questions to him was well why would God let you murder your wife and then go out and have just a great life?  I mean, why would that happen?  And he said he didn't know.  Didn't know.  But, you know, we're not supposed to know God's plan.  And so—but that he was absolutely certain that he was going to be exonerated and that I was the attorney that should do it and, so.[148]

Counsel testified that Tiaffay rejected the State's plea offer because the State would not accept an *Alford*[149] plea, and Tiaffay did not want to admit guilt and did not want his daughter to know he was guilty.[150]  Tiaffay asked trial counsel whether they could use prescription medication as a defense, and trial counsel "talked about the downside," explained he didn't think it would persuade a jury, and they mutually agreed it would not be successful.[151]  Counsel believed that Tiaffay was "worried that people were going to find out that he actually did it" and was bringing up his medication "to set up an excuse" to explain his actions.[152]  Counsel believed that Tiaffay was motivated to use a medication-related defense because he feared "that [his

---

[148] *Id.* at 57–60.

[149] *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970) ("An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.").

[150] ECF No. 64-11 at 63–64.

[151] *Id.* at 48–50, 52, 55, 61.

[152] *Id.* at 52–53.

daughter] would see her father as a killer" if he was found guilty before he could provide some external reason for his conduct.[153]  But counsel had experience with intoxication defenses and advised Tiaffay that it was a losing strategy that would not result in acquittal.[154]  Counsel testified that "[u]sually medications that I found where it was a successful defense was something that was more spur of the moment" and he "couldn't find anything where the time period involving an alleged conspiracy and the actual execution of the murder was months and months."[155]  Tiaffay ultimately agreed to scuttle that defense to pursue a Stevens-acted-alone strategy.[156]

Trial counsel testified that, for the penalty phase, he did not obtain the assistance of a psychiatrist or psychologist to analyze records and present testimony from a mental-health professional because "bringing in evidence of the fact that he was taking pills for a muscle injury was a weak mitigator to the point that it might backfire the other way . . . ."[157]  Counsel noted that the evidence would show that Tiaffay's injury and medications "did not keep him out of the fire house" or prevent him from "taking his child on hikes and doing all sorts of other things," while "at the same time that he is involved in doing things surrounding the ultimate execution of the murder."[158]  Counsel believed that a jury would not be sympathetic to a medication-related mitigation defense because of those circumstances.[159]

---

[153] *Id.*

[154] *Id.* at 52–53, 61–62.

[155] *Id.*

[156] *Id.* at 65.

[157] *Id.* at 56–57.

[158] *Id.* at 47, 50–51, 56–57.

[159] *Id.*

Trial counsel also explained that they did not enter Tiaffay's confession as mitigation at sentencing because they "had agreed at that point at least for the appeal and the—and the writ that we would maintain that the State hadn't proved beyond a reasonable doubt the conspiracy," "that way if he was granted a new trial, there would be—there wouldn't be the issue of everybody knowing he did it."[160]  Counsel explained to Tiaffay that, in his experience, "when you have a case [in which] you're hoping to win on appeal . . . or postconviction habeas, part of that is the psychology . . . of reviewing courts" and that "if a reviewing court has some inkling that in fact" the defendant has admitted guilt, it is harder to overcome a reviewing court's inclination to find that any trial errors were harmless.[161]  There was a period of time after the trial but before the penalty phase when Tiaffay wanted to admit guilt because "his conscience was getting to him."[162]  But at that point he did not want to rely on any drug-use excuse, and he ultimately decided that the "best strategy [was] to not say he did it."[163]

### 3.   The Nevada Supreme Court affirmed the denial of Tiaffay's state habeas petition, finding that trial counsel was not ineffective for failing to delve into his mental health.

The state district court denied Tiaffay's petition and he appealed to the Nevada Supreme Court (NSC),[164] which affirmed the denial.[165]  With respect to the claims at issue in this federal petition, the NSC determined that Tiaffay didn't show that his counsel was ineffective for failing

---

[160] *Id*. at 54–55.

[161] *Id*. at 62 (cleaned up).

[162] *Id.* at 65.

[163] *Id*.

[164] ECF No. 64-11 at 75–77; ECF No. 65-8; ECF No. 65-1.

[165] ECF No. 14-17.

1  to investigate his mental health and prescription-drug use in order to pursue an insanity defense

2  or to use those issues as mitigating evidence at the penalty and sentencing phases:

3      Appellant George Tiaffay contends that the district court erred in
   denying his claims of ineffective assistance of counsel.  To prove

4  ineffective assistance of counsel, a petitioner must demonstrate
   that counsel's performance was deficient in that it fell below an

5  objective standard of reasonableness, and resulting prejudice such
   that there is a reasonable probability that, but for counsel's errors,

6  the outcome of the proceedings would have been different.
   *Strickland v. Washington,* 466 U.S. 668, 687–88 (1984); *Warden v.*

7  *Lyons,* 100 Nev. 430, 432 33, 683 P.2d 504, 505 (1984) (adopting
   the test in *Strickland*).  Both components of the inquiry must be

8  shown, *Strickland,* 466 U.S. at 697, and the petitioner must
   demonstrate the underlying facts by a preponderance of the

9  evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33
   (2004).  We give deference to the district court's factual findings if

10  supported by substantial evidence and not clearly erroneous but
    review the court's application of the law to those facts de novo.

11  *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

12      [A]ppellant argues that past head injuries, hormone therapy, and
    prescription drug use caused increased aggression and possible

13  psychosis, accordingly, trial counsel should have investigated and
    presented evidence about appellant's psychological condition as

14  both a defense to the charges and as mitigation at sentencing.
    Appellant has not demonstrated deficient performance.  At trial,

15  the State alleged that appellant spent weeks planning the victim's
    murder with his alleged coconspirator who carried out the murder.

16  Rather than concede appellant's culpability and present the
    psychological evidence, trial counsel concluded that the best

17  defense would be to assert that the alleged coconspirator acted
    alone.  Counsel perceived appellant's proposed mental illness

18  defense was a means to explain his conduct to his family and
    friends and not a genuine trial strategy.  Given the tenuous nature

19  of the psychological evidence and the risks associated with
    acknowledging culpability, appellant has not overcome the

20  presumption that counsel performed effectively.  *See Strickland,*
    466 U.S. at 689–90; *Doleman v. State,* 112 Nev. 843, 848, 921

21  P.2d 278, 280–81 (1996) (recognizing that strategic decision[s] are
    "virtually unchallengeable absent extraordinary circumstances."

22  (quotation marks omitted)).  Further, appellant has not
    demonstrated prejudice.  Appellant and his coconspirator plotted

23  the murder while appellant worked, cared for his daughter, and
    fostered an amicable relationship with the victim to avoid any

suspicion related to her death.  Given the patience, subterfuge, and perseverance involved in this plot, appellant has not demonstrated a reasonable probability that he would not have been convicted or would have received a more lenient sentence if counsel introduced evidence about appellant's mental health.  Therefore, the district court did not err in denying this claim.[166]

## Analysis

### A.    Legal Standards

#### 1.    *The Antiterrorism and Effective Death Penalty Act (AEDPA)*

Federal habeas relief is governed by the Antiterrorism and Effective Death Penalty Act, also known as "AEDPA."  If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[167]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[168]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[169]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or

---

[166] ECF No. 14-17 at 2–3.

[167] 28 U.S.C. § 2254(d).

[168] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[169] *White v. Woodall*, 572 U.S. 415, 424–27 (2014).

1    "license federal courts to treat the failure to do so as error."[170]  The "objectively unreasonable"

2    standard is difficult to satisfy;[171] "even 'clear error' will not suffice."[172]  As the United States

3    Supreme Court acknowledged in *Harrington v. Richter*, "[i]f this standard is difficult to meet,

4    that is because it was meant to be."[173]

5    So the AEDPA bar is high, and federal habeas relief may only be granted if "there is no

6    possibility [that] fairminded jurists could disagree that the state court's decision conflicts with

7    [the Supreme Court's] precedents."[174]  As "a condition for obtaining habeas relief," a petitioner

8    must show that the state-court decision "was so lacking in justification that there was an error

9    well understood and comprehended in existing law beyond any possibility of fairminded

10   disagreement."[175]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state

11   court's decision," habeas relief under Section 2254(d) is precluded.[176]  AEDPA "thus imposes a

12   'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court

13   decisions be given the benefit of the doubt.'"[177]

14

15

16

_____

17   [170] *Id.* at 425–26.

18   [171] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

19   [172] *Wood v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (citation omitted); *see also Schriro v.
     Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes

20   the state court's determination was incorrect but whether that determination was unreasonable—
     a substantially higher threshold.").

21   [173] *Harrington v. Richter,* 562 U.S. 86, 102 (2011).

     [174] *Id.*

22   [175] *Id.* at 103.

23   [176] *Id.* at 101.

     [177] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

1      If a federal district court finds that the state court committed an error under § 2254, the

2 district court must then review the claim de novo.[178]  The petitioner bears the burden of proving

3 by a preponderance of the evidence that he is entitled to habeas relief,[179] but state-court factual

4 findings are presumed correct unless rebutted by clear and convincing evidence.[180]

5    **2.   *Ineffective assistance of counsel***

6      The right to counsel embodied in the Sixth Amendment provides "the right to the

7 effective assistance of counsel."[181]  Counsel can "deprive a defendant of the right to effective

8 assistance[] simply by failing to render 'adequate legal assistance[.]'"[182]  In the hallmark case of

9 *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance

10 claim requires a petitioner to show that: (1) his counsel's representation fell below an objective

11 standard of reasonableness under prevailing professional norms in light of all of the

12 circumstances of the particular case (the deficient-performance prong);[183] and (2) it is reasonably

13 probable that, but for counsel's errors, the result of the proceeding would have been different

14 (the prejudice prong).[184]

15      Any review of the attorney's performance must be "highly deferential" and must adopt

16 counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of

17

---

18 [178] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we
may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error,

19 we must decide the habeas petition by considering de novo the constitutional issues raised.").

20 [179] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[180] 28 U.S.C. § 2254(e)(1).

21 [181] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397
U.S. 759, 771 n.14 (1970)).

22 [182] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344–50 (1980)).

23 [183] *Id.* at 690.

[184] *Id.* at 694.

hindsight.[185]  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom."[186]  The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions.[187]  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[188]  Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]"[189]  However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[190]

        To show that there was a reasonable probability that the petitioner was prejudiced by his counsel's deficient performance, he must show "probability sufficient to undermine confidence in the outcome."[191]  "The likelihood of a different result must be substantial, not just conceivable."[192]  A petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and

---

[185] *Id.* at 689.

[186] *Harrington*, 562 U.S. at 105.

[187] *Id.* at 104–05.

[188] *Strickland*, 466 U.S. at 689.

[189] *Id.* at 690.

[190] *Id.* at 690–91.

[191] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

[192] *Harrington*, 562 U.S. at 112; *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).

1  "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is

2  reliable."[193]

3       The United States Supreme Court describes federal review of a state supreme court's

4  decision on an ineffective-assistance claim as "doubly deferential."[194]  So the reviewing judge

5  must "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens

6  of § 2254(d)'"[195] and consider only the record that was before the state court that adjudicated the

7  claim on its merits.[196]

8       ***3.    Procedurally defaulted claims***

9       "Procedural default" refers to the situation in which a petitioner presented a claim to the

10  state courts, but the state courts disposed of the claim on procedural grounds instead of on its

11  merits.[197]  As the Supreme Court explained in *Coleman v. Thompson*, a procedural default

12  prevents the federal court from reviewing a habeas claim unless the petitioner can show good

13  cause plus actual prejudice or a fundamental miscarriage of justice:

14       In all cases in which a state prisoner has defaulted his federal
         claims in state court pursuant to an independent and adequate state
15       procedural rule, federal habeas review of the claims is barred
         unless the prisoner can demonstrate cause for the default and actual
16       prejudice as a result of the alleged violation of federal law or
         demonstrate that failure to consider the claims will result in a
17       fundamental miscarriage of justice.[198]

18

19

20  [193] *Strickland*, 466 U.S. at 687–88.

21  [194] *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).
     [195] *Id.*
22  [196] *Id.* at 180–85.

23  [197] *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).
     [198] *Id.* at 750; *see also Murray v. Carrier*, 477 U.S. 478, 485 (1986).

30

To demonstrate cause for a procedural default, the petitioner must be able to "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule.[199]  That external impediment must have prevented the petitioner from raising the claim.[200]  The procedural-default doctrine ensures that the state's interest in correcting its own mistakes is respected in all federal habeas cases.[201]

A federal habeas court may excuse the procedural default of a claim of ineffective assistance of trial counsel if (1) the claim of ineffective assistance of trial counsel is "substantial"; (2) there was "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral-review proceeding was the "initial" review proceeding with respect to the ineffective-assistance-of-trial-counsel claim;[202] and (4) state law requires that an ineffective-assistance-of-trial-counsel claim "be raised in an initial-review collateral proceeding."[203]  On all such issues, if reached, the court's review is de novo.[204]

"The Supreme Court has said little about the meaning of 'substantial,' but has cited as analogous the standard for granting a certificate of appealability under 28 U.S.C. § 2253."[205]  "For a certificate of appealability to issue, a habeas petitioner must show 'that reasonable jurists

---

[199] *Murray*, 477 U.S. at 488 (emphasis added).

[200] *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

[201] *See Koerner v. Grigas*, 328 F.3d 1039, 1046 (9th Cir. 2003).

[202] Nevada law requires prisoners to raise ineffective-assistance-of-counsel claims for the first time in a state petition seeking postconviction review, which is the initial collateral review proceeding for purposes of applying the *Martinez* rule.  *See Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

[203] *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 18 (2012)).

[204] *See, e.g.*, *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017); *Detrich v. Ryan*, 740 F.3d 1237, 1246–48 (9th Cir. 2013).

[205] *Leeds v. Russell*, 75 F.4th 1009, 1018 (9th Cir. 2023) (citing *Martinez*, 566 U.S. at 14).

could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement.'"[206]  "Under that standard, a court should conduct a general assessment of the merits but should not decline to issue a certificate merely because it believes the applicant will not demonstrate an entitlement to relief."[207]  This standard "is not as stringent as that required when considering the merits of the underlying [*Strickland*] claim."[208]  An ineffective-assistance claim "is insubstantial" if it lacks merit or is "wholly without factual support."[209]

### B. Trial counsel was not constitutionally ineffective for failing to investigate or pursue an insanity defense related to Tiaffay's deific-decree delusions (Ground 3).

In Ground 3, Tiaffay alleges that trial counsel provided ineffective assistance by failing to investigate and pursue an insanity defense on the grounds that Tiaffay's medication-induced delusions made him believe that God instructed him to kill Shauna to protect M.T.[210]  He alleges that counsel's pursuit of the defense that Stevens acted alone was ineffective due to the strong evidence of Tiaffay's involvement.[211]  He argues, based on Sussman's opinion that an individual suffering delusions is not necessarily irrational in other aspects of his life, that his counsel was ineffective for failing to investigate and present an insanity defense.[212]  Respondents argue that the NSC reasonably determined that counsel was not ineffective because he made a strategic

---

[206] *Id.* (quoting *Apelt v. Ryan*, 878 F.3d 800, 828 (9th Cir. 2017)).

[207] *Id.* (cleaned up).

[208] *Id.* at 1017–18 (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022)).

[209] *Martinez*, 566 U.S. at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

[210] ECF No. 31 at 24–25.

[211] *Id.*

[212] *Id.*

1    decision to pursue a different defense and that, given the premeditated nature of the crime and

2    tenuous nature of the psychological evidence, Tiaffay's insanity defense would not have

3    persuaded any rational jury to reach a different verdict.[213]

4

### 1.    This court defers to the NSC's reasonable application of federal standards and will not consider evidence that isn't part of the state-court record.

6    Respondents contend that this court may not consider Exhibits 17–51 and 60[214]—

7    containing records of Tiaffay's military history, some of his medical records, and newspaper

8    articles concerning his family's history of alcohol abuse—because Tiaffay failed to develop them

9    as part of the state-court record.[215]  Tiaffay concedes that he did not develop Exhibits 17–51 and

10   60 during the state-court proceeding, but he argues that this court may consider them under de

11   novo review because the NSC's decision was unreasonable.[216]  He contends that the NSC failed

12   to consider Sussman's testimony or report concerning the effects of his testosterone therapy and

13   prescription drug use because "the court doesn't mention Dr. Sussman at all."[217]  And because

14   "the report and testimony were central and essential components" of his claim, overlooking that

15   evidence made the NSC's decision objectively unreasonable.[218]

16   Tiaffay's argument ignores statements in the NSC's opinion indicating that it did

17   consider Sussman's evaluation and testimony.  That evaluation was in the state-court record

18

19

---

20   [213] ECF No. 92 at 8–14.

21   [214] ECF Nos. 32, 34.

     [215] ECF No. 92 at 5–8. *See* 28 U.S.C. § 2254(e)(2).

22   [216] ECF No. 99 at 8–10.

23   [217] *Id.* at 9.

     [218] *Id.*

considered by the NSC.[219]  And though the NSC doesn't mention Sussman by name, the opinion

discusses Tiaffay's argument that "past head injuries, hormone therapy, and prescription-drug

use caused increased aggression and possible psychosis," and rejected it, noting that "the tenuous

nature of the psychological evidence and the risks associated with acknowledging culpability"

were valid reasons for counsel to avoid presenting that type of evidence to the jury.[220]  So

because the NSC considered Sussman's testimony and report, Tiaffay fails to establish that the

NSC's determination was based on an unreasonable determination of fact.  I thus conduct

deferential review of Ground 3 without considering Exhibits 17–51 and 60.

### 2. An insanity defense based on delusional beliefs may act as a complete defense to a crime only in limited circumstances.

For insanity to act as a complete defense, a defendant in Nevada must satisfy the

*M'Naghten*[221] test, under which the jury determines whether the defendant "knew the nature and

quality of [his] acts, had the capacity to determine right from wrong, or knew whether [he] was

doing wrong when [he] committed the crime."[222]  "[D]elusional beliefs can only be the grounds

for legal insanity when the facts of the delusion, if true, would justify the commission of the

criminal act."[223]  "If, however, the delusional facts would not amount to a legal defense, then [the

defendant] is not insane."[224]  For example, "[p]ersons suffering from a delusion that someone is

shooting at them, so they shot back in self-defense are insane under *M'Naghten*," but "[p]ersons

---

[219] *See* ECF No. 34-8 at 13; ECF No. 65-11 at 3; ECF No. 65-13; ECF No. 65-14.

[220] ECF No. 14-17 at 2–3.

[221] *M'Naghten's Case,* 8 Eng.Rep. 718, 10 Cl. & Fin. 200, 209 (1843).

[222] *Clark v. State*, 588 P.2d 1027, 1029 (Nev. 1979) (cleaned up).

[223] *Finger v. State*, 27 P.3d 66, 85 (Nev. 2001).

[224] *Id.*

34

who are paranoid and believe that the victim is going to get them some time in the future, so they hunt down the victim first, are not."[225]  "Unless a defendant presents evidence that complies with this standard, he . . . is not entitled to have the jury instructed on the issue of insanity."[226]

In *Finger v. State*, the NSC explained that "if a person was under a delusion that God wanted certain people killed and, based upon hearing the voice of God, that individual immediately began killing people around them," that person would not be legally insane under the *M'Naghten* standard because "[t]he individual knew that he was killing human beings and that he was not authorized by law to take a human life . . . ."[227]  Based on the limited record in *Finger*, the NSC determined that Finger had killed his mother because of his delusional belief that she was conspiring with others to kill him, and he needed to kill her before she could carry out her scheme.[228]  The NSC explained that "[i]f this was his delusional belief, Finger would not qualify as legally insane" because "there is no evidence that, in his delusion, he believed he was in imminent danger which, if true, would justify self–defense."[229]

### 3.    *Trial counsel's decision not to investigate an insanity defense was not deficient.*

In postconviction proceedings, the NSC reasonably determined that trial counsel's performance was not deficient due to the tenuous nature of the after-the-fact psychological evidence.  Indeed, Sussman testified that he was not prepared or qualified to assess whether Tiaffay's psychological impairments could form the basis of a valid insanity defendant because

---

[225] *Id.*

[226] *Id.*

[227] *Id.* at 73.

[228] *Id.*

[229] *Id.* at 85.

he was not asked to consider that issue.[230]  But he did opine that he found Tiaffay's circumstances to be only "minimally mitigating in terms of" an insanity defense.[231]  Even if I were to assume that counsel was aware of the delusions, drug use, and stressors Sussman discussed in his report, I cannot conclude that counsel was deficient for failing to concoct an insanity defense from that information because the psychological evaluation itself doesn't support it.

More importantly, trial counsel's testimony forecloses a finding that his strategic choices were incompetent.  This court must review counsel's performance not with the benefit of hindsight, but through "counsel's perspective at the time."[232]  And the record shows that counsel hadn't received any information that should have prompted a reasonable attorney to investigate an insanity defense.

Tiaffay did not inform trial counsel that he was having medication-induced hallucinations or delusions that God told him to have Shauna killed.  Tiaffay's medical records from two days before the murder state that he denied having hallucinations and his presentence-investigation report states that he denied incidents of childhood abuse or neglect.  And though trial counsel testified that Tiaffay appeared hyper-religious and told him that his exoneration was part of God's plan, no reasonable lawyer would suspect that such religious zeal would warrant an investigation into whether his client could be deemed legally insane.

Trial counsel also explained that he and Tiaffay mutually agreed not to pursue a medication-related strategy because it would admit culpability, which Tiaffay didn't want to do,

---

[230] ECF No. 64-11 at 27.

[231] *Id.*

[232] *Strickland*, 466 U.S. at 689.

and because counsel believed it was a losing strategy. Tiaffay told counsel that he was taking

medication for a job-related muscle injury. Counsel perceived that to mean that Tiaffay was

essentially taking pain killers and concluded that, given the lengthy, premeditated nature of

Tiaffay's involvement in the crime, a jury wouldn't be swayed by that weak excuse. So, because

Tiaffay failed to report any facts that would cause a reasonably prudent attorney to look into a

possible insanity defense and because counsel had a sound trial strategy to poke holes in the

State's conspiracy case while not admitting culpability, I find that trial counsel did not render

deficient performance by avoiding further inquiry into the petitioner's mental health or drug use

to support a potential insanity defense. The NSC thus reasonably determined that counsel's

failure to pursue an insanity defense was not deficient performance under *Strickland*.

### 4. Tiaffay wasn't prejudiced by counsel's choice not to pursue an insanity defense.

The NSC also reasonably determined that Tiaffay was not prejudiced by the failure to

pursue an insanity defense. "To qualify as being legally insane, a defendant must be in a

delusional state such that he cannot know or understand the nature and capacity of his act, or his

delusion must be such that he cannot appreciate the wrongfulness of his act, that is, that the act is

not authorized by law."[233] As I previously explained, "the evidence at trial—which was heavy

on premeditation, planning, and cover up"—"would not lead a reasonable juror to conclude that

Tiaffay was not guilty by reason of insanity."[234] Moreover, "delusional beliefs can only be the

---

[233] *See Finger*, 27 P.3d at 84–85.

[234] *See* ECF No. 77 at 13–15 (citing *Blake v. State,* 121 P.3d 567, 576 (Nev. 2005) (finding overwhelming evidence against a finding of insanity where the defendant killed victims after a period of reflection, fled, disposed of the murder weapon, developed an alibi, and lied to hospital personnel when seeking medical assistance).

1  grounds for legal insanity" in Nevada if "the facts of the delusion, if true, would justify the

2  commission of the criminal act."[235]

3      Even if Tiaffay had told his counsel that he believed his murder plot was dictated by God,

4  that does not establish a legal justification for arranging Shauna's murder or the commission of

5  any of the crimes alleged against him.  Tiaffay told Sussman that God told him to murder Shauna

6  because she "was going to take [his] daughter astray."[236]  Assuming that explanation is true, the

7  NSC's analysis in *Finger* forecloses his argument that any insanity defense based on this premise

8  would have been successful.  The *Finger* court held that paranoid delusions causing a person to

9  believe that he must kill someone before they take some harmful action does not constitute a

10 valid insanity defense because the delusion isn't predicated on the belief that such a murder

11 would be legally justified.  Here, Tiaffay essentially argues that because of his delusional belief

12 that Shauna may harm M.T. sometime in the future, he needed to kill her before that could

13 happen.  That delusion is clearly invalid as an insanity defense under *Finger*.[237]  So, even if I

14 were to assume that counsel should have unearthed evidence of Tiaffay's delusions before trial,

15 his failure to do so was not prejudicial because those delusions do not support a valid insanity

16 defense.  There this thus no reasonable probability that, had counsel raised the defense, the

17 verdict would have been different.  So I deny habeas relief on Ground 3 because the NSC

18

19 ───────────────
   [235] *Finger*, 27 P.3d at 85.

20 [236] ECF No. 34-8 at 5.

21 [237] *See Finger*, 27 P.3d at 85 (explaining that "[p]ersons who are paranoid and believe that the
   victim is going to get them some time in the future, so they hunt down the victim first," do not

22 satisfy the insanity defense); *see also Sidhu v. State*, 554 P.3d 210 (Nev. 2024) (relying on
   *Finger*, 27 P.3d at 84–85, and reiterating that "a delusion involving a future plot, as opposed to a

23 perceived immediate danger, is insufficient to support an insanity defense" and "delusional
   beliefs can only be grounds for legal insanity when the *facts of the delusion*, if true, would justify
   the commission of the criminal act").

1  reasonably applied *Strickland* when determining that trial counsel was not ineffective on that

2  ground.

**C.    Trial counsel's failure to investigate and present mitigating evidence at the penalty phase and at sentencing does not warrant habeas relief (Ground 4(A)).**

In Ground 4(A), Tiaffay alleges that trial counsel was ineffective because he failed to investigate and present mitigation evidence concerning Tiaffay's medications and mental health during the penalty phase and sentencing. Respondents argue that this portion of Ground 4 should be denied on the merits because the NSC's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*. They theorize that trial counsel made a strategic choice not to present evidence that may have admitted guilt and to instead focus his mitigation case on Tiaffay's otherwise clean record, military service, career as a firefighter, and general good character. Tiaffay responds that the trial court's statements at sentencing show that, had the court and the penalty-phase jury been confronted with an explanation (i.e., medication-induced delusions and various stressors) for the dramatic departure from his otherwise glowing record, there's a reasonable possibility that they would have considered him less culpable for his actions and given him a more lenient sentence.

> ### 1.    Trial counsel wasn't on notice that a mitigation investigation into Tiaffay's mental health or prescription-drug use was warranted.

Tiaffay alleges that trial counsel unreasonably failed to present evidence at the penalty phase and sentencing of Tiaffay's delusional beliefs that God instructed him to arrange Shauna's murder. He claims that his delusions "had many causes, including (1) the side effects of his ongoing prescription-medication regimen; (2) a life-long religious zeal; (3) his extreme anxiety over M.T.'s well-being; (4) heavy alcohol use tied to a family history of alcoholism; (5) sleep

deprivation due to his odd work schedule as a fireman; (6) the stress of the divorce; (7) financial difficulties; and (8) preexisting mental-health issues stemming from childhood abuse and generational trauma."[238]  Tiaffay insists that, had the jury or trial court been given a plausible explanation for the offense based on his delusions and their causes, there's a reasonable probability that they would've returned more favorable sentences on his charges.[239]

At the penalty phase, "evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant, or victim and on any other matter which the court deems relevant to the sentence, whether or not the evidence is ordinarily admissible."[240]  If "counsel is aware of potentially mitigating evidence, he or she must investigate that evidence, absent a reasonable strategic reason not to do so."[241]  So in *Bemore v. Chappell*, for example, the Ninth Circuit found that defense counsel was "on notice" that the defendant had a history of manic episodes, was a heavy drug user, was "severely beaten as a child in a manner and to a degree that brain damage could have resulted," and had received a psychiatric evaluation indicating that he "may have been bipolar or suffered other mental disorders."[242]  In the face of all of that information, the court held that it was unreasonable for counsel not to investigate

---

[238] ECF No. 31 at 26–29.

[239] *Id*. at 28.  I do not consider Tiaffay's Exhibits 17–51 and 60 in support of this claim, as he concedes that he failed to develop them as part of the state-court record and does not argue that this claim should be reviewed de novo with new evidence.  *See* ECF No. 99 at 21–30.  To the extent that he intended to so argue, I find that the NSC is entitled to deference on this ground for the same reasons I discussed supra at 33–34.

[240] Nev. Rev. Stat. § 175.552(3) (cleaned up).

[241] *Bemore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (noting that, if "counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in the penalty-phase hearing, without a supporting strategic reason, constitutes deficient performance").

[242] *Bemore*, 788 F.3d at 1171.

Bemore's mental health before settling on a mitigation strategy that relied on portraying Bemore as a "good guy."[243]

Unlike in *Bemore*, the record here does not support the inference that counsel had notice of potential mental-health or drug-use issues, so it wasn't objectively unreasonable not to delve deeper into those areas.  At most, counsel was on notice that Tiaffay was taking "medications related to . . . a job injury he had," and when the pair discussed whether it would make sense to "put on a defense" related to his drug use, they agreed that it would not be a winning strategy.[244] Counsel explained that he didn't believe a "drugs made me do it" defense would be effective because "the actual execution of the murder was months and months," and his experience taught him that a medication defense would sway a jury only when the murder "was more spur of the moment."[245]  Counsel conceded that he did not look into Tiaffay's drug use when preparing his mitigation defense because Tiaffay never mentioned the medications in that context and that, based on what Tiaffay did tell him about his medications, he didn't believe that "taking pills for a muscle injury" would provide any missing context about why Tiaffay meticulously planned his wife's murder.[246]  Counsel also noted that he didn't believe the drug-use excuse would make a difference when there was evidence that, while Tiaffay was planning the murder, he was working as a fireman, "taking his child on hikes[,] and doing all sorts of other things," facts that called into question the impact that his medications had on his functional capacity.[247]  In short, the information that trial counsel had at the time would not have put him on notice that a deep dive

---

[243] *Id.* at 1172–74.

[244] ECF No. 64-11 at 49.

[245] *Id.* at 47, 49.

[246] *Id.* at 57.

[247] *Id.*

1  into Tiaffay's medications or medical records would yield mitigating evidence.  Sussman's after-

2  the-fact evaluation of Tiaffay's prescriptions does not change that result, as it was primarily

3  based on Tiaffay's self-reports that raised issues Tiaffay never raised with his counsel.

4      Nor was counsel put on notice of any mental-health issues, including deific-decree

5  delusions or childhood abuse, that would have made for compelling mitigation evidence in this

6  case.  Counsel testified that Tiaffay mentioned God to him a couple of times, but that he did not

7  state that God told him to murder his wife.  Rather, Tiaffay conveyed to his counsel that he

8  believed God was "okay with [Tiaffay] committing this murder," that "God was going to use [the

9  murder] for God's purpose," and that he believed he would be exonerated because he was going

10  to fulfill a "greater purpose" in life.[248]  Counsel explained that Tiaffay's religious comments did

11  not seem to stem from delusional thinking.  He instead took the comments as Tiaffay's attempt

12  to justify his actions, noting that, in his experience, defendants sometimes turn to religion when

13  in custody and awaiting trial.

14      None of Tiaffay's comments would have put counsel on notice that his client may be

15  suffering from deific-decree delusions stemming from a cocktail of prescription drugs.  So it was

16  not objectively unreasonable for trial counsel not to seek a psychiatric evaluation based on

17  Tiaffay's hyper-religious beliefs.  Nor was it unreasonable for counsel to forego digging into

18  Tiaffay's childhood, as Tiaffay himself described his childhood as "good" and "denied any

19  incidents of physical or sexual abuse, or neglect" in his presentence-investigation report.  Indeed,

20  much of counsel's mitigation case focused on Tiaffay's record of academic, athletic, and social

21  success as a young person.  Counsel's choice not to search for evidence of a bad childhood,

22

23

---

[248] *Id.* at 58.

1  when the evidence he had uncovered indicated that Tiaffay had a positive upbringing, was not

2  unreasonable.

3

4  ## 2. Trial counsel's strategic decision to put on a good-character mitigation defense was not deficient based on counsel's knowledge at the time.

5  Counsel's strategic decision to focus on a good-character mitigation defense was not

6  objectively unreasonable given the lack of notice that an investigation into some other defense

7  concerning Tiaffay's mental health or drug use would have been fruitful.[249]  Unlike counsel in

8  *Bemore*, who chose to put on a "good-guy" defense despite being aware of several facts

9  indicating that he was not really that good of a guy,[250] counsel here reasonably strategized that

10  Tiaffay's glowing record could be an asset to him at sentencing.  Particularly in light of the fact

11  that this was a premeditated crime, and that Tiaffay appeared completely competent and capable

12  of going about his day-to-day life without complications from his medications or mental-health

13  issues, it was sensible for counsel to eschew an investigation into Tiaffay's mental health to

14  focus instead on his good deeds.

15  Counsel also explained that he wished to avoid any mitigation defense that could be

16  interpreted as admitting guilt, stating that Tiaffay himself ultimately decided that he didn't want

17  to confess to the crime and his experience had taught him that it was harder to obtain appellate

18  relief if the defendant admitted guilt.  Tiaffay argues that the "defense didn't need to

19  affirmatively concede guilt to present the mitigation case at issue here; the defense could've

20

21  [249] *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) ("While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable decision that particular investigations are unnecessary.").

22  [250] *See Bemore*, 788 F.3d at 1173–74 (noting that counsel was aware of allegations that Bemore
23  exhibited objectively bad behavior while in custody awaiting trial, including "several instances of assault" and one instance in which Bemore poisoned the prison's food in an attempt to help inmates escape while being transported to a hospital).

simply submitted evidence of the various challenges Mr. Tiaffay faced in 2012 that led to what the jury ultimately concluded was his involvement in a murder plot."[251]  But it's fairly clear that digging into Tiaffay's alleged deific-decree delusions would have involved an admission of guilt because Tiaffay now claims that those delusions led him to kill his wife.

If counsel were to avoid mentioning those delusions, Tiaffay's remaining "mitigating evidence" becomes very flimsy.  He took fairly common prescription medications—Adderall is prescribed to schoolchildren, and even Sussman conceded in his report that, compared to methamphetamine, prescribed amphetamines like Adderall "are significantly less likely to produce psychosis and dramatically less likely to cause persisting brain damage."[252]  And while his high testosterone levels could be tied to increased aggression, it's difficult to conclude that a jury would have handed down a reduced sentence based on possible effects from doctor-monitored hormone therapy.  His 2018 reports of childhood trauma and abuse were not mentioned to his counsel, nor did he report them during his presentencing investigation.

Tiaffay also has failed to show that the remaining stressors he mentions—"a life-long religious zeal," "extreme anxiety over" his daughter's well-being, sleep deprivation, divorce stress, financial difficulties, and "heavy alcohol use"[253]—would have led to a different sentencing result had counsel raised them.  Based on the brutal particulars of Tiaffay's involvement in the month-long plot (i.e., advising Stevens on what hammer type to use, acknowledging that he expected Stevens to hit Shauna so hard that a traditional wood-handled hammer would break), the fact that Tiaffay plotted the murder while he "worked, cared for his

---

[251] ECF No. 99 at 27.

[252] ECF No. 34-8 at 11.

[253] ECF No. 31 at 26.  Sussman's evaluation shows that Tiaffay reported having two drinks every other day during this time period.  ECF No. 34-8 at 21.

daughter, and fostered an amicable relationship with the victim to avoid any suspicion related to her death," and the given "patience, subterfuge, and perseverance involved in this plot," it wasn't objectively unreasonable for counsel to avoid raising these rather run-of-the-mill daily stressors as mitigating evidence of his crime.

Nor do I find that the Nevada Supreme Court unreasonably concluded that counsel's strategic decision not to investigate or introduce this evidence did not prejudice Tiaffay's sentencing. Had the sentencing jury or trial court been aware of the alleged causes of Tiaffay's delusional beliefs, fairminded jurists would disagree over whether there was a reasonable probability that Tiaffay may have received a more lenient sentence. So, because counsel's performance was not deficient or prejudicial, the Nevada Supreme Court did not misapply the law, and habeas relief is not available on Ground 4(A).

### D.     Tiaffay's remaining ineffective-assistance claim is procedurally defaulted (Ground 4(B)).

Tiaffay adds in Ground 4(B) that his trial counsel provided ineffective assistance by failing to object to the prosecutor's statement that Tiaffay purposefully allowed M.T. to see Shauna's dead body at the crime scene.[254] Tiaffay failed to fairly present this claim to the state courts, so I must consider whether he had established cause and prejudice to overcome his procedural default.[255]

At the penalty phase, the State urged the jury to impose a life sentence without parole, arguing that Tiaffay intentionally took M.T. to see Shauna's dead body to avoid appearing guilty:

> [The prosecutor]: [Y]ou cannot escape from this fact in this case: Is that's the image that M.T. saw at 9:15 in the morning when she walked into that residence,

---

[254] ECF No. 31 at 28–29.

[255] *See* ECF No. 20-3; ECF No. 20-13 at 7.

> and George Tiaffay intentionally did it. Why? To make 12 people think he didn't commit this crime. That's the only reason why he would ever walk his 8-year-old daughter inside that house. And if you don't think that that act in and of itself earned him life without [parole], think about what it did to M.T.[256]

During Tiaffay's interview with Metro, he said he "walked right in" to Shauna's apartment, M.T. was behind him and, as soon as he saw Shauna's feet, he told M.T. to stay at the garage door.[257] Metro asked if he thought M.T. saw Shauna and he replied, "I don't think so."[258]

There was no evidence upon which to draw a reasonable inference that M.T. saw Shauna's dead body, and objection to "that's the image that M.T. saw at 9:15 in the morning when she walked into that residence" would have alerted the jury to consider whether there was evidence to support the State's assertion. No fairminded jurist would debate that an objectively reasonable attorney would object to the State's argument. Tiaffay has therefore established a substantial claim that trial counsel's performance was deficient under *Strickland*.

But Tiaffay fails to establish a substantial claim that his counsel's failure to object was prejudicial. Although objection would have alerted the jury that there was no evidence to support the State's assertion, the trial court had already instructed the jury at the outset of the trial that it was the jury's duty to apply the law to the facts as the jury found them from the evidence.[259] The jury was instructed that the "statements, arguments, and opinions of counsel are not evidence" and "whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be . . .

---

[256] ECF No. 62-3 at 48.

[257] ECF No. 32-12 at 4, 10–12 (transcript of Tiaffay's voluntary statement to police). Although the transcript of Tiaffay's statement isn't in the state-court record, I consider it because the corresponding audio recording was admitted at trial, *see* ECF No. 56-1 at 123–24, and it is relevant to this claim.

[258] *Id*. at 15–16.

[259] *Id*. at 2.

1  .”[260]  It was also told “to consider only the evidence in the case in reaching a verdict . . . and

2  draw reasonable inferences from the evidence . . . keeping in mind that such inferences should

3  not be based on speculation or guess.”[261]  Had counsel objected, the trial court would have given

4  a curative instruction directing the jury to the previously given instructions.  Because it is a well-

5  settled presumption that jurors follow their instructions, and Tiaffay has not presented any basis

6  to rebut that presumption,[262] there is no substantial claim that there is a reasonable probability,

7  but for counsel’s failure to object, the jury would have imposed a more lenient sentence.

8        Tiaffay fails to establish a substantial claim that trial counsel’s performance was

9  prejudicial under *Strickland* and therefore fails to establish the requisite cause and prejudice to

10  overcome the procedural default of his claim.  Ground 4(B) is thus dismissed with prejudice as

11  technically exhausted by procedural default.[263]

12  **E.  A certificate of appealability is granted on Ground 4(A) only.**

13        The right to appeal from the district court’s denial of a federal habeas petition requires a

14  certificate of appealability.  To obtain a certificate, the petitioner must make a “substantial

15  showing of the denial of a constitutional right.”[264]  If a “district court has rejected the

16  constitutional claims on the merits,” a petitioner must demonstrate that reasonable jurists would

17  find the district court’s assessment of the constitutional claims debatable or wrong.[265]  For

18  procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate

19

20  [260] ECF No. 61-5 at 44, 56 (cleaned up).

21  [261] *Id*. at 52.

22  [262] *See Weeks v. Angelone,* 528 U.S. 225, 234 (2000).

   [263] *Martinez*, 566 U.S. at 14–16.

23  [264] 28 U.S.C. § 2253(c).

   [265] *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

(1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.[266]

Applying these standards, I deny a certificate of appealability on Grounds 3 and 4(B) because I find that no reasonable jurist would disagree with my conclusion that counsel was ineffective for failing to raise an insanity defense or with my procedural-default analysis on ground 4(B). But reasonable jurists may find debatable my assessment of Tiaffay's claim that his counsel was ineffective for failing to investigate his psychiatric health and prescription-drug use, so I grant a certificate of appealability on Ground 4(A) only.

## Conclusion

IT IS THEREFORE ORDERED that:

1. The Second Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 [ECF No. 31] is DENIED.

2. A certificate of appealability is **GRANTED** for Tiaffay's Ground 4(A) claim that his counsel was ineffective for failing to investigate his mental health and prescription-drug use for the penalty phase of his trial. A certificate of appealability is **DENIED** for all other claims.

---

[266] *Id.*; *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

3.  All requests for an evidentiary hearing are **DENIED**.

4.  The Clerk of Court is directed to:

    a.  **SUBSTITUTE** Terry Royal for respondent Calvin Johnson;

    b.  **ENTER JUDGMENT** accordingly; and

    c.  **CLOSE THIS CASE**

_____
U.S. District Judge Jennifer A. Dorsey
September 22, 2025

49